[L. A. No. 24244. In Bank. Oct. 19, 1956.]

GUY HALL, Respondent, v. THE CITY OF TAFT et al.,
Appellants.

Henry G. Baron, City Attorney, and Allen Grimes for Appellants.

Mack, Bianco, King & Eyherabide and Dominic Bianco for Respondent.

Edmund G. Brown, Attorney General, Richard H. Perry, Deputy Attorney General, Johnson & Stanton, Gardiner Johnson and Thomas E. Stanton, Jr., as Amici Curiae on behalf of Respondent.

CARTER, J.—Defendants, Taft, a nonchartered city of the sixth class, its council and chief of police, appeal from a judgment enjoining it from enforcing against plaintiff, a building contractor, its building ordinance.

There is no dispute as to the facts. On April 22, 1955, plaintiff as contractor entered into a contract with Taft Union High School and Junior College District, hereafter called district, a school district duly organized under the state laws, to construct in Taft for the district, a school building for $614,113. The plans and specifications for the building were approved by the State Department of Education and State Division of Architecture. Plaintiff commenced construction which was to be completed in 320 days, but work was "stopped" by Taft, the city, demanding that plaintiff obtain a building permit from it involving a $300 fee and submission to the building ordinance* of Taft. The district has employed an inspector to assure that the building is constructed according to the plans and specifications. Defendants assert that plaintiff has refused to obtain a permit from the city for the construction of the building and they intend to enforce the penal and civil provisions of the building ordinance of the city.

The issue is whether a municipal corporation's building regulations are applicable to the construction of a public school building by a school district in the municipality. Taft argues that it had power to adopt police regulations—building construction regulations under the Constitution.†

The public schools of this state are a matter of statewide rather than local or municipal concern; their establishment, regulation and operation are covered by the Constitution and the state Legislature is given comprehensive powers in relation thereto. The Legislature shall not pass local or special laws "Providing for the management of common schools." (Cal. Const., art. IV, § 25, subd. 27.) "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, *the Legislature* shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement." (Emphasis added; *id.*, art. IX, § 1.) There

---

*Taft by ordinance had adopted the "Uniform Building Code 1952 edition adopted and published by the Pacific Coast Officials Conference in 1952."

†"Any county, city, town, or township may make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws." (Cal. Const., art. XI, § 11.)

is a State Board of Education, an elected superintendent of public instruction and there are county superintendents whose salary and qualifications are prescribed by the Legislature (*id.,* art. IX, §§ 3, 3.1, 7). The proceeds of all public lands that have been or may be granted by the United States to the state and other property is "inviolably" appropriated to the support of the common schools (*id.,* art. IX, § 4) and "Out of the revenue from state taxes for which provision is made in this article, together with all other state revenues, there shall first be set apart the moneys to be applied by the State to the support of the Public School System and the State University." (*Id.,* art. XIII, § 15.) "The *Legislature* shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established." (Emphasis added; *id.,* art. IX, § 5.) "The Public School System shall include all kindergarten schools, elementary schools, secondary schools, technical schools, and state colleges, established in accordance with law and, in addition, the school districts and the other agencies authorized to maintain them. No school or college or any other part of the Public School System shall be, directly or indirectly, transferred from the Public School System *or placed under the jurisdiction of any authority* other than one included within the Public School System. . . .

"The Legislature shall provide for the levying annually by the governing body of each county, and city and county, of such school district taxes, at rates not in excess of the maximum rates of school district tax fixed or authorized by the Legislature, as will produce in each fiscal year such revenue for each school district as the governing board thereof shall determine is required in such fiscal year for the support of all schools and functions of said district authorized or required by law." (Emphasis added; *id.,* art. IX, § 6.) A school district may lie in more than one county and may issue bonds. (*Id.,* art. IX, § 6½.) No money shall ever be appropriated for "any school not under the exclusive control of the officers of the public schools. . . ." (*Id.,* art. IX, § 8.) "The *Legislature* shall have power, by general law, to provide for the incorporation and organization of school districts, high school districts, and junior college districts, of every kind and class, and may classify such districts." (Emphasis added; *id.,* art. IX, § 14.) In harmony with those provisions it has been held that the power of the state Legislature over

the public schools is plenary, subject only to any constitutional restrictions. (*Pass School Dist.* v. *Hollywood City School Dist.*, 156 Cal. 416, 418 [105 P. 122, 20 Ann.Cas. 87, 26 L.R.A.N.S. 485] ; *Kennedy* v. *Miller,* 97 Cal. 429 [32 P. 558] ; *Worthington School Dist.* v. *Eureka School Dist.,* 173 Cal. 154 [159 P. 437] ; *Merrill etc. School Dist.* v. *Rapose,* 125 Cal.App. 2d 819 [271 P.2d 522] ; see *Woodcock* v. *Dick,* 36 Cal.2d 146 [222 P.2d 667] ; *Seidel* v. *Waring,* 36 Cal.2d 149 [222 P.2d 669].) ▆ The public school system is of statewide supervision and concern and legislative enactments thereon control over attempted regulation by local government units. (*Esberg* v. *Badaracco,* 202 Cal. 110 [259 P. 730] ; *Cloverdale Union H. S. Dist.* v. *Peters,* 88 Cal.App. 731 [264 P. 273] ; *Piper* v. *Big Pine School Dist.,* 193 Cal. 664 [226 P. 926] ; *Kelso* v. *Board of Education,* 42 Cal.App.2d 415 [109 P.2d 29] ; *Kennedy* v. *Miller, supra,* 97 Cal. 429 ; *Worthington School Dist.* v. *Eureka School Dist., supra,* 173 Cal. 154 ; *Board of Education* v. *Davidson,* 190 Cal. 162 [210 P. 961] ; *Phelps* v. *Prussia,* 60 Cal.App.2d 732 [141 P.2d 440] ; *Lansing* v. *Board of Education,* 7 Cal.App.2d 211 [45 P.2d 1021] ; *People* v. *Mertz,* 2 Cal.2d 136 [39 P.2d 422] ; *Gerth* v. *Dominguez,* 1 Cal.2d 239 [34 P.2d 135].) It is said in *Piper* v. *Big Pine School Dist., supra,* 193 Cal. 664, 669 : ''It [the education of the children of the state] is in a sense exclusively the function of the state which cannot be delegated to any other agency. The education of the children of the state is an obligation which the state took over to itself by the adoption of the Constitution. To accomplish the purposes therein expressed the people must keep under their exclusive control, through their representatives, the education of those whom it permits to take part in directing the affairs of state.'' ▆ School districts are agencies of the state for the local operation of the state school system. (*Cloverdale Union H. S. Dist.* v. *Peters, supra,* 88 Cal.App. 731, 738 ; *Board of Education* v. *Davidson, supra,* 190 Cal. 162, 168 ; *Butler* v. *Compton Junior College Dist.,* 77 Cal.App.2d 719 [176 P.2d 417] ; *Lansing* v. *Board of Education, supra,* 7 Cal.App.2d 211 ; *Merrill etc. School Dist.* v. *Rapose, supra,* 125 Cal.App.2d 819.) ▆ The beneficial ownership of property of the public schools is in the state. It is said in *Pass School Dist.* v. *Hollywood City School Dist., supra,* 156 Cal. 416, 419 : ''To the contention that a transfer of ownership thus accomplished works the taking of property without due process of law, it should be sufficient

to point out that in all such cases the beneficial owner of the fee [of public school property] is the state itself, and that its agencies and mandatories—the various public and municipal corporations in whom the title rests — are essentially nothing but trustees of the state, holding the property and devoting it to the uses which the state itself directs. The transfer of title without due process of law, of which appellant so bitterly complains, is nothing more, in effect, than the naming by the state of other trustees to manage property which it owns and to manage the property for the same identical uses and purposes to which it was formerly devoted. In point of law, then, the beneficial title to the estate is not affected at all. All that is done is to transfer the legal title under the same trust from one trustee to another. In this sense the trustees of the Hollywood City School District became, by operation of law, successors to the trustees of the Pass School District, as is directly held in *Allen* v. *School Town of Macey*, 109 Ind. 559 [10 N.E. 578], where it is said: 'It is now a well-recognized legal inference deducible as well from general principles as from the decided cases, that under the constitution and laws of this state, public school property is held in trust for school purposes by the persons or corporations authorized for the time being to control such property, and that it is in the power of the legislature to provide for a change in the trusteeship of such property in certain contingencies presumably requiring such a change, or, indeed, to change the trustees of that class of property whenever it may choose to do so.'

"Even if such well-established principles could be set aside under the plea that they work injustice in the individual case, this plea here presented is without merit. The state is profoundly interested in the education of its young, but has no deep concern over the personality of the trustees who shall administer this trust, so long as the administration is in the orderly form of law." (See *Fawcett* v. *Ball*, 80 Cal.App. 131, 136 [251 P. 679] ; *Butler* v. *Compton Junior College Dist.*, 77 Cal.App.2d 719 [176 P.2d 417] ; *Kennedy* v. *Miller*, 97 Cal. 429 [32 P. 558] ; *Gridley School Dist.* v. *Stout*, 134 Cal. 592 [66 P. 785].) ▇ While a large degree of autonomy is granted to school districts by the Legislature, we are referred to no statute or constitutional provision which, as far as the question here involved is concerned, expressly makes school buildings or their construction any more amenable to regulation by a municipal corporation than structures which are

built and maintained by the state generally for its use. ▮ When it engages in such sovereign activities as the construction and maintenance of its buildings, as differentiated from enacting laws for the conduct of the public at large, it is not subject to local regulations unless the Constitution says it is or the Legislature has consented to such regulation. Section 11 of article XI of the state Constitution, *supra,* should not be considered as conferring such powers on local government agencies. Nor should the Government Code sections which confer on a city the power to regulate the construction of buildings within its limits (see Gov. Code, §§ 38601, 38660) be so considered. It is said in *In re Means,* 14 Cal.2d 254, 258 [93 P.2d 105], holding that a state employee working on a state structure in a city need not meet the requirements of a city charter provision: "If one who has been employed by the state may not work on state property within a municipality without the consent of the municipality obtained after examination, the city has, in effect, added to the requirements for employment by the state, and restricted the rights of sovereignty. . . .

"Turning to the contentions of the respondent that the regulation of plumbing is a municipal affair, the rule to be applied is not entirely a geographical one. Under certain circumstances, an act relating to property within a city may be of such general concern that local regulation concerning municipal affairs is inapplicable. . . . For example, where one of the city's streets has been declared by an act of the legislature to be a secondary highway, the improvement of that street is not a municipal affair within the meaning of the Constitution. . . . Also, regulations prescribed by charter or ordinance of a city requiring that the work of altering and improving buildings be subject to local supervision have been held inapplicable to state building. (*City of Milwaukee* v. *McGregor,* 140 Wis. 35 [121 N.W. 642, 17 Ann.Cas. 1002].)

"In the case of *Kentucky Institution for Education of Blind* v. *City of Louisville,* 123 Ky. 767 [97 S.W. 402, 8 L.R.A.N.S. 553], the city attempted to enforce an ordinance relating to fire escapes with respect to a state institution for the blind. The court held the ordinance inapplicable, stating: 'The principle is that the state, when creating municipal governments does not cede to them any control of the state's property situated within them, nor over any property which the state has authorized another body or power to control.

The municipal government is but an agent of the state, not an independent body. It governs in the limited manner and territory that is expressly or by necessary implication granted to it by the state. It is competent for the state to retain to itself some part of the government even within the municipality, which it will exercise directly, or through the medium of other selected and more suitable instrumentalities. How can the city ever have a superior authority to the state over the latter's own property, or in its control and management? From the nature of things it cannot have.' '' (See also *Board of Education* v. *City of St. Louis*, 267 Mo. 356 [184 S.W. 975]; *Salt Lake City* v. *Board of Education*, 52 Utah 540 [175 P. 654]; 31 A.L.R. 450.)

*Pasadena School Dist.* v. *Pasadena*, 166 Cal. 7 [134 P. 985, Ann.Cas. 1915B 1039, 47 L.R.A.N.S. 892], fails to consider the factors above mentioned and insofar as it is inconsistent with this opinion it is overruled. The question here considered was not involved in *Roman Catholic etc. Corp.* v. *City of Piedmont*, 45 Cal.2d 325, 332-333 [289 P.2d 438].

■ Moreover, in connection with the foregoing and as an additional ground why the construction of school buildings by school districts are not subject to the building regulations of a municipal corporation in which the building is constructed, is that the state has completely occupied the field by general laws, and such local regulations conflict with such general laws, when we consider the activity involved. ■ A city may not enact ordinances which conflict with general laws on statewide matters. (*Simpson* v. *City of Los Angeles*, 40 Cal. 2d 271 [253 P.2d 464]; *Pulcifer* v. *County of Alameda*, 29 Cal.2d 258 [175 P.2d 1]; *Ex parte Daniels*, 183 Cal. 636 [192 P. 442, 21 A.L.R. 1172]; *Atlas Mixed Mortar Co.* v. *City of Burbank*, 202 Cal. 660 [262 P. 334]; *Ganley* v. *Claeys*, 2 Cal. 2d 266 [40 P.2d 817]; *In re Murphy*, 190 Cal. 286 [212 P. 30]; *In re Mingo*, 190 Cal. 769 [214 P. 850]; *Natural Milk etc. Assn.* v. *City etc. of San Francisco*, 20 Cal.2d 101 [124 P.2d 25]; *Pipoly* v. *Benson*, 20 Cal.2d 366 [125 P.2d 482, 147 A.L.R. 515]; *Tolman* v. *Underhill*, 39 Cal.2d 708 [249 P.2d 280].) The particular situation presented and discussed in those cases is not helpful. *In re Means, supra,* 14 Cal.2d 254, herein discussed is most pertinent as it involves the attempted regulation of a state activity by a city, as distinguished from regulations of the members of the public.

The Education Code sets out a complete system for the construction of school buildings. The Legislature there de-

clares that it is in the interest of the state to aid school districts in the construction of school buildings for the maintenance of the public school system inasmuch as the system is of general concern and the education of the children is an obligation and function of the state. (Ed. Code, §§ 5021, 5041.) The governing board of any school district shall manage and control the school property within its district (*id.*, § 18001). It (the board) shall furnish and repair the school property. (*Id.*, § 18002.) It shall provide as a part of school buildings patent flush water closets for the use of the pupils (*id.*, § 18009). It may repair old buildings by day's labor or by force account (*id.*, §§ 18055, 18057). The State Department of Education shall: ''Establish standards for school buildings,'' review and approve all plans and specifications for buildings and disapprove those not meeting the standards, furnish plans, specifications and ''building codes,'' and make rules and regulations to carry out those activities (*id.*, §§ 18102, 18101). ''The governing board of any school district may, and when directed by a vote of the district shall, build and maintain a schoolhouse (*id.*, § 18151). Except in cities having a board of education the county superintendent shall pass upon all plans for school buildings and plans shall be submitted to him. ''The Division of Architecture of the Department of Public Works under the police power of the State shall supervise the construction of any school building or, if the estimated cost exceed four thousand dollars ($4,000), the reconstruction or alteration of or addition to any school building, for the protection of life and property.'' (*Id.*, § 18191.) '' 'Construction or alteration' as used in this article includes any construction, reconstruction, or alteration of, or addition to, any school building.'' (*Id.*, § 18193.) ''The Division of Architecture shall pass upon and approve or reject all plans for the construction or alteration of any school building. To enable it to do so, the governing board of each school district and any other school authority before adopting any plans for a school building shall submit the plans to the Division of Architecture for approval, and shall pay the fees prescribed in this article.'' (*Id.*, § 18194.) ''Before letting any contract for any construction or alteration of any school building, the written approval of the plans, as to safety of design and construction, by the Division of Architecture, shall be first had and obtained.'' (*Id.*, § 18195.) ''In each case the application for approval of the plans shall be

accompanied by the plans and full, complete, and accurate specifications, and structural design computations, and estimates of cost, which shall comply in every respect with any and all requirements prescribed by the Division of Architecture." (*Id.*, § 18196.) All plans and specifications shall be prepared by a duly state licensed architect or engineer and the supervision of the work shall be by a duly licensed person. (*Id.*, § 18199.) No contract for construction is valid and no public money shall be paid for any work or materials furnished thereunder "unless the plans, specifications, and estimates comply in every particular with the provisions of this article and the requirements prescribed by the Division of Architecture and unless the approval thereof in writing has first been had and obtained from the division." (*Id.*, § 18200.) Progress reports must be made to the division (*id.*, § 18201). "The State Division of Architecture shall make such inspection of the school buildings and of the work of construction or alteration as in its judgment is necessary or proper for the enforcement of this article and the protection of the safety of the pupils, the teachers, *and the public.* The school district, city, city and county, or the political subdivision within the jurisdiction of which any school building is constructed or altered shall provide for and require competent, adequate, and continuous inspection during construction or alteration by an inspector satisfactory to the architect or structural engineer and the Division of Architecture. The inspector shall act under the direction of and be responsible to the architect or structural engineer." (Emphasis added; *id.*, § 18203.) The division may adopt rules and regulations to carry out its duties and a violation of the provisions is a felony (*id.*, §§ 18202, 18204). If the supervisor of health of any school district notes any defect in "plumbing, lighting, or heating," he shall report to the district and if it does not act, to the county superintendent. (*Id.*, § 18221.) Each building, if two or more stories, shall have fire escapes (*id.*, § 18222).

■ It is urged, however, that the foregoing provisions must be read in the background in which they were adopted, that is, that some of them were placed in the Education Code from the Field Act adopted in 1933 (Stats. 1933, ch. 59) and must be construed with the Riley Act of 1933 (Stats. 1933, ch. 601) now in the Health and Safety Code, sections 19100-19170. The Riley Act provides that all buildings (with certain exceptions Health & Saf. Code, § 19100) must meet certain standards which are set forth (*id.*, §§ 19150, 19151).

Building permits must be obtained from the proper city or county officers charged wtih the enforcement of laws regulating construction (*id.*, § 19120). Any city or county may establish construction standards higher than those established by sections 19150 and 19151 of the Health and Safety Code. Plans and specifications for buildings shall be filed with the application for a building permit (*id.*, § 19132). Both the Field and Riley acts were enacted as urgency measures, the urgency being stated to be the series of earthquakes occurring shortly prior thereto (Stats. 1933, ch. 59, § 9; 1933, ch. 601, § 8.) We do not believe, however, that the Health and Safety Code provisions (Riley Act) limit or modify the provisions of the Education Code (Field Act) above discussed. The former deal with structural design aimed at procuring buildings less dangerous from the standpoint of earthquakes (Health & Saf. Code, §§ 19150, 19151) while the latter, as above pointed out, are broad and comprehensive including the whole field of construction regulations. The urgency that impelled the Legislature to enact both as urgency measures may have been the same but the scope is clearly different. Hence the provisions in the former providing for more stringent local regulations are not applicable to the latter.

Reference is made to rules and regulations, past and present, adopted for the construction of school buildings under the Education and Health and Safety Codes. (Cal. Administrative Code, tit. 21, Public Works, Division of Architecture, chap. 1, subchap. 1.) The purpose of the rules (we refer to the rules now in existence) is to protect lives and property of the people by regulating the design and construction of public school buildings so that, in addition to the normal loads to which such buildings are subjected, they shall resist future earthquakes. (Tit. 21, subchap. 1, group 1, art. I, § 1.) The rules are intended to establish ''reasonable standards and minimum requirements'' for the construction of such buildings in order to attain the requisite stability to withstand loads and forces ''and to insure safety of construction'' (*id.*, § 2). The detailed regulations set forth in sections 101 to 1206 have been adopted as a basis for the approval of plans and specifications. ''It is not the intention to limit the ingenuity of the designer nor to interfere with existing building rules and regulations where such rules and regulations are more stringent. Where the designer desires to depart from the methods of analysis set up by these rules and regulations, it will be necessary that he submit his method in detail

188

together with complete information including computations and test data covering the design in question. Permission to deviate from these rules and regulations is optional with the Division of Architecture and is dependent upon the division being satisfied that the structural members or portions of the building involved would provide at least such safety as would have been obtained had these rules and regulations been adhered to strictly.'' (*Id.,* § 70.) ''Regulations and design values established in these rules and regulations are minimum requirements. Nothing herein contained shall be interpreted to interfere with or to waive the requirements of applicable local or state building laws or ordinances where the requirements of those laws are more stringent than the requirements of these rules and regulations.'' (*Id.,* § 115.) However, it is also provided that: ''No rule or regulation shall be construed to deprive the Division of Architecture of its right to exercise the powers conferred upon it by law, or to limit the division in such enforcement of the act as is necessary to secure safety of construction and the proper administration of the law.'' (*Id.,* § 5.)

 It is very doubtful that those rules indicate an intention to interpret the Education Code sections to mean that a city's building regulations must be met in the construction of a school building. They tend more to indicate that the school districts could follow such regulations as well as those of the state but are not bound to do so. In any event, since the final construction of a statute is the function of the courts (2 Cal.Jur.2d, Administrative Law, § 17), we hold the statutes here involved should not be construed as requiring a school district to comply with the building regulations of a city.

There is no necessity for comparing in detail Taft's building code and the numerous comprehensive building regulations contained in the Education Code and the rules and regulations of the Division of Architecture, for as we have seen the state has occupied the field. As said in *In re Means, supra,* 14 Cal.2d 254, 258, 260, in speaking of the effect of a city ordinance, establishing standards for plumbers, on a state employee in a city, the state civil service system provides a comprehensive plan for the selection of state employees and although the city ordinance does not purport to prescribe the conditions for state employment, ''If one who has been employed by the state may not work on state property within a

municipality without the consent of the municipality obtained after examination, the city has, in effect, *added to the requirements for employment by the state, and restricted the rights of sovereignty. . . .*

''Although the legislature has enacted no statute regulating plumbing, if the city's ordinance is a valid exercise of power, then one whom the state has examined and found eligible for employment as a plumber and who has later entered the state civil service may be unable to work on state property because he cannot pass the examination of a city health officer or licensing board. The result is a direct conflict of authority. Either the local regulation is ineffective or the state must bow to the requirement of its governmental subsidiary. Upon fundamental principles, that conflict must be resolved in favor of the state.'' (Emphasis added.) The same comments apply to the references in the instant construction contract and specifications that the building is to be constructed in compliance with local regulations.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., Spence, J., and McComb, J., concurred.